THOMAS A. CARY and THOMAS A. CARY AND WARD H. OEHMANN, EXECUTORS U/W ANNA MAY CARY, DECEASED, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cary v. Commissioner
Docket No. 6336-69.
United States Tax Court
T.C. Memo 1973-197; 1973 Tax Ct. Memo LEXIS 87; 32 T.C.M. (CCH) 913; T.C.M. (RIA) 73197; September 10, 1973, Filed *87 Petitioners' wholly-owned corporation, Pica, was engaged in the real estate development business. Pica contracted to purchase two large tracts of land to subdivide and sell. At closing time Pica did not have sufficient cash to commit to the settlement requirements and carrying charges until these tracts could be developed. Pica sold the tracts to petitioners at its cost who in turn sold the tracts to syndicates in which petitioners owned 50-percent interests and unrelated third parties, who put up the necessary cash, owned the other 50-percent interests. The participants in the syndicates acquired the land for speculative investment purposes and the syndicates did not develop, promote, or otherwise improve the land while they owned it. Within a year thereafter the syndicates sold all of one tract and a part of the other back to Pica at a considerable profit. Held: Petitioners' distributive share of the profits realized by the syndicates on the resale of the land to Pica is taxable as capital gain and not as ordinary income. 2 Ward H. Oehmann, for the petitioners. James Q. Smith, for the respondent. DRENNEN
MEMORANDUM FINDINGS OF FACT AND OPINION DRENNEN, Judge: Respondent *88 determined deficiencies in petitioners' income taxes for the tax years 1965 and 1966, in the amounts of $18,080.35 and $76,229.93, respectively. Several issues having been conceded before trial, we are presented with the sole issue whether profits realized by petitioners from the sale of various parcels in two separate tracts of land to a family real estate development corporation are capital gains or ordinary income. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. Petitioner Thomas A. Cary (Cary, or petitioner) and his wife, Anna May Cary, filed joint Federal income tax returns for the tax years 1965 and 1966 with the district director of internal revenue, in Richmond, Va. Thomas A. Cary was a resident of Springfield, Va., at the time the petition herein was filed; Anna May Cary, deceased, is represented by Thomas A. Cary and Ward H. Oehmann, executors of her estate. Petitioner and his wife (petitioners) maintained their books and records under a cash method of accounting during the years at issue. 3 Thomas A. Cary came to the Washington, D.C. area in 1937 and took a job with the Army Corps of Engineers, a position which lasted for approximately *89 10 years. After his work with the Corps of Engineers, petitioner held various tectonic positions such as FHA consultant and architectural consultant and project engineer for several local developers until approximately 1959 when he went into business for himself. During the initial year of his self-employment petitioner was a partner in Pittman & Cary, a partnership which built 35 homes for resale in northern Virginia. In 1960 the partnership was incorporated in Virginia under the name Pica, Inc. (Pica), and Cary became the sole shareholder. The corporation was formed to enhance the borrowing capabilities of the business, and like its predecessor, Pica was primarily engaged in real estate development. In 1965 Pica's articles of incorporation were amended to change its name to Thomas A. Cary, Inc. (Cary, Inc). Subsequently, in 1966, Cary, Inc.'s articles of incorporation were amended to increase its authorized capital stock from 100 to 200 shares, each with a par value of $100. With petitioner already in possession of 100 shares of Cary, Inc., additional shares were issued in 1966: certificates of 30 shares were issued to each of his two brothers, and certificates of 10 shares *90 were issued to two of the company's employees. 4 Since the incorporation of his business in 1960, petitioner has served as president of Pica and Cary, Inc., [1] doing all of his real estate development or sales work as an employee of the corporation, with the following exceptions: (1) Petitioner participated in the two real estate joint ventures in 1964 and 1965 at issue herein; (2) petitioner sold one personal residence; (3) petitioner bought and still owns 10 acres of a residential subdivision; and (4) petitioner bought and now has under contract to sell 275 acres of unimproved rural mountain land in northern Virginia. On May 16, 1963, Pica entered into a contract to purchase 321.9622 acres of land in Fairfax County, Va. (Kelsey tract). The land is located in an area known as the Pohick watershed and is bounded on two sides by Rolling Road and Sydenstricker Road. The contract price of the Kelsey tract was $700,000, payable as follows: $129,000 cash at settlement; assumption of Kelsey deed of trust having a balance due of $174,000; assumption of Rust deed of trust having a balance of $60,000; and balance in deferred purchase *91 money notes totaling $377,000. As a part of the purchase agreement, three preconditions to final settlement on the property required Pica's success in first obtaining (1) R-12.5 zoning on the tract; (2) authorization to complete a sewage treatment plant; and (3) FHA and 5 and VA approvals for financing. Settlement was to be held November 30, 1963, provided the contingencies were met or waived by Pica. By November 30, 1963, none of the contingencies had been met. Subsequently, by letter dated December 3, 1963, the sellers of the Kelsey tract offered to extend the settlement date to May 16, 1964, if Pica would pay the property taxes on the tract due Fairfax County. Pica paid the property taxes, and on December 16, 1963, the contract of sale was formally amended to extend the settlement date to May 16, 1964, and permit Pica to seek R-17 zoning of the tract. On May 16, 1964, the contract of sale was again amended to extend the settlement date to November 16, 1964, or 30 days after approval of contruction of a sewage treatment plant if sooner, but no later than November 16, 1964. The extension agreement also made appropriate changes in the payment schedules set out in the original *92 contract and provided for an $8,000 payment to Benjamin S. Kelsey, holder of the first deed of trust on the property, as consideration for the extension. Pica and the sellers of the Kelsey tract amended the contract of sale a third time on October 27, 1964. The new provisions added at that time provided: (1) That payments on the deferred notes would commence 90 days after 6 sanitary trunk sewer facilities were made available or authorization to construct a sewage treatment plant was granted, whichever was first, but, in any event, not later than November 16, 1969; (2) that settlement would definitely take place on November 16, 1964; and (3) that Pica had the right to assign its interest in the contract, subject to the approval of Benjamin S. Kelsey. The principal reason for the delays in coming to settlement on the Kelsey tract was the lack of proper sewage facilities in the Pohick watershed. Pica wanted to be certain that adequate means of sewage disposal would be available in the near future so the corporation's planned residential subdivision could be started without delay. Cary, as president of Pica, believed he had a valuable piece of land in the Kelsey tract and at a good *93 price. However, although it appeared reasonably certain the Pohick watershed would eventually be provided public sewage services, it was not clear when the service would be available, and Cary did not want to have his company's working capital tied up in property which could not be immediately developed. Pica was at that time engaged in developing and selling another real estate project in the area and needed working capital. [2] 7 During the period from May 1963 to October 1964, Pica, as contract purchaser, employed an attorney, John Hazel, to obtain the proper zoning necessary to subdivide and develop the Kelsey tract. Hazel believed the principal obstacle to obtaining the rezoning was the lack of adequate sewage disposal. In the early months of 1964 Hazel concluded that Pica would not be allowed to build its own sewage treatment facility and that Fairfax County would probably not provide any sewage service *94 for the Pohick watershed in the immediate future. He told Cary of his conclusion, but continued to seek the rezoning desired by Pica on the tract. By May 16, 1964, Hazel had obtained approval from the proper authorities to have the Kelsey tract rezoned R-17. Sometime thereafter he met with Cary and Benjamin Kelsey, at which time he told them he felt Pica would be unable to meet the purchase contract condition concerning the provision for adequate sewage treatment facilities. Hazel then suspended his work on the Kelsey tract until the later spring of 1965. At the same time John Hazel was working to get the Kelsey tract rezoned, Pica employed an engineering firm, Carroll-Kim Associates, to survey and plat the property, and also to obtain permission from the proper public authorities to build a sewage treatment plant or to tie the tract in with an existing public facility. In June 1963 the firm began an investigation of the feasibility of sewering the 8 Kelsey tract. The investigation revealed that the property contained 30 acres, or approximately 60 lots, which could be sewered by gravity if connected to the Keene Mill Pumping Station in the neighboring Accotink watershed. Upon *95 further investigation, however, it was determined that an agreement between the Board of County Supervisors of Fairfax County and the corporation that built the Keene Mill plant limited the services of the facility to a land area which did not include the Kelsey tract. In addition to the sewage study in 1963, Carroll-Kim Associates also made a study of the feasibility of rezoning the Kelsey tract, did preliminary work on lot layouts, and began plat computations and sketches. By June 1964 the firm had completed all of its mapping and plotted boundary lines for the entire Kelsey tract. Thereafter, Carroll-Kim Associates suspended its work on the Kelsey tract until April 1965. In April 1964 Fairfax County employed Alexander Potter Associates, a civil engineering firm, to make a feasibility study on an integrated sewering system for the Pohick watershed and other areas in the county. When the study was authorized, the county officials decided to deny all requests of local developers for permission to install interim sewage disposal facilities until the results of the study became public. The moratorium was employed to prevent 9 a proliferation of small, inefficient sewage plants in *96 the Pohick watershed when there was a possibility the county would sewer the whole area properly in the near future. Prior to the county's request for the study in April 1964, it was general knowledge among local developers that Fairfax County would have trunk lines up and down the Pohick watershed at some time in the future. Additionally, before the study was commissioned, one developer had gained approval of its application to build a temporary sewage treatment plant in the Pohick watershed to service his development. In October 1964, as the settlement date under the purchase contract approached, Cary discussed Pica's problem with representatives of Weaver Bros., Inc., a mortgage banking firm in Washington, D.C., which had provided most of the construction and permanent financing for Pica's development projects. It was decided that it would be best for Pica to sell its interest in the Kelsey tract to a syndicate (Kelsey syndicate) which would provide the necessary cash to meet the settlement costs with petitioners (the Cary group) receiving a 50-percent interest in the syndicate in exchange for the contract rights, and with Pica being given the right of first refusal to buy the *97 land when development became feasible. Three individuals undertook to raise the necessary funds, for a fee. They assembled a group of investors, 10 most of whom were employees of Weaver Bros., referred to as the RBJ group, who were willing to provide the funds and take a 50-percent interest in the syndicate. Accordingly, on the designated settlement date the Kelsey tract was purchased in the following manner. First, under an agreement dated November 16, 1964, Pica assigned to petitioner and his wife, as tenants by the entirety, all rights under the contract to buy the Kelsey tract, together with all sums paid by Pica on the purchase price, carrying charges, engineering studies, attorney's fees, and other costs. In return, petitioner and his wife tendered to Pica a promissory note, dated November 16, 1964, to pay $50,000 in 5 years, with interest of 6 percent, and secured by their rights under the trust indenture in a collateral agreement of the same date. [3] Following the *98 assignment of the contract rights, the Cary group and the RBJ group entered into a trust agreement, dated November 16, 1964, under which Cary, James E. Millar, and Martin R. West were to be the trustees and titleholders of the Kelsey tract. Under the terms of the trust agreement, the Cary group contributed the purchase contract rights to the joint venture, and the RBJ group contributed 11 $102,000. The Cary group additionally agreed to pay any settlement costs in excess of the $102,000 contributed by the RBJ group, [4] and both groups were to share equally the carrying charges under the purchase arrangement. Distribution of the profits derived from resale of the property was to be in equal proportions to the Cary group and the RBJ group, after, however, 10 percent of the profits had been paid to the financiers who arranged the venture. The property could be sold, encumbered, or conveyed only upon the concurrence of both groups in the venture. Finally, under the agreement, Pica or any other corporation in which Cary had a controlling interest, was granted the right of first refusal to purchase the Kelsey tract at a reasonable price from the trustees. The three trustees in the venture *99 acquired title to the tract by deeds dated November 14, 1964. The Alexander Potter study was completed and presented to the Fairfax County Board of Supervisors in December 1964. Thereafter, at a public hearing held on March 17, 1965, the Board approved a resolution to request the local circuit court to order a referendum on the proposed bond issue to finance the construction of the public sewage 12 facilities in the Pohick watershed. The Fairfax County voters subsequently approved the bond issue for $20 million on May 4, 1965. Subsequent to the presentation of the feasibility study the Fairfax County Board of Supervisors extended the moratorium on temporary sewage treatment plants. The moratorium continued until the summer of 1965, when it became apparent that financing difficulties would prolong completion of the new county facility and its trunk lines until after 1968 [5] *100 and the Board realized that it would be in the best interests of all concerned to permit development with temporary sewage disposal facilities until the trunk line was completed. In early summer of 1965 it began to appear that at least part of the Kelsey tract could be immediately developed by use of temporary sewer arrangements. Cary was anxious to begin development so, as president of Pica, he negotiated to purchase the entire tract from the syndicate, pursuant to Pica's right of first refusal. The transaction was arranged and Pica agreed to purchase the tract in two parcels under separate purchase contracts, both dated June 16, 1965. One parcel containing 117.169 acres was to be purchased for approximately $700,000 and the other parcel containing 13 204.7932 acres was to be purchased for approximately $1,400,000. [6] These sales prices were determined by Martin R. West and James E. Millar, two of the three trustees who held title, and were approximately equal to the estimated value placed on the property in two independent appraisal reports. Settlement on the first parcel took place on October 15, 1965, [7] at which time Pica paid the syndicate $163,280.83 in cash. [8] The remaining parcel of 204.7932 acres was conveyed to Pica by deed, dated April 17, 1967, upon the terms set forth in the *101 purchase contract dated June 16, 1965. 14 With the authorization of the bond issue on May 16, 1965, John Hazel and Carroll-Kim Associates resumed their work for Pica on the Kelsey tract. By June 1965 the engineers had completed the preliminaries of the entire Kelsey tract *102 and were beginning the final plats and construction plans for the section sewerable by gravity. They also determined the best interim solution for sewage for the remainder of the tract and Pica ultimately entered into an agreement with its neighboring developer, Camelot Builders, Inc., to share the cost of a temporary sewage facility for the use of both developments. Construction of the temporary facility began in June 1966, although plans for the installation, which had the approval of the County Board of Supervisors, were begun in July 1965. During the entire existence of the Kelsey syndicate, its financial records were kept by a CPA who treated the enterprise as a joint venture, setting up capital accounts for both the Cary group and the RBJ group. The CPA prepared annual tax data concerning the venture's operations which were submitted to the three trustees for distribution to the individual ventures. However, no partnership informational returns were filed by the joint venture in any year of its existence because the accounting firm thought it was unnecessary unless the venture was actively engaged in business. 15 On June 28, 1965, Pica contracted to purchase 136.7985 acres *103 of land in Fairfax County (Footer tract) for $700,000. Jerome Footer and certain others as trustees were the titleholders of the tract which was encumbered by a mortgage of $135,384.62. Under the terms of the purchase contract settlement was to be held on December 28, 1965, at which time a cash payment of $200,000 was to be paid. The land which comprises the Footer tract was zoned partially for single-family residential use and partially for multiple-family residential use. The property was contiguous to another development built by Pica and, unlike the Kelsey tract, it had a public sewage treatment installation available to service a new residential development. At the time Pica entered into the purchase contract for the Footer tract it was accumulating cash from other developments and Cary thought it would be able to meet the settlement costs without third-party financing. However, in the fall of 1965 the money market tightened considerably, and Pica's funds were depleted through payment of extra "points" for its construction and permanent financing. Cary again decided that it would be too risky for Pica to commit the funds required for settlement to this one project, so he *104 went back to his coventurers at Weaver Bros. to seek third-party financing. An arrangement similar to the Kelsey syndication was worked out. 16 In December 1965 Pica assigned its rights in the Footer tract to Thomas A. Cary and his wife as tenants by the entirety, including payments made by Pica [9] *105 for engineering studies, attorney's fees, and other expenses. On December 27, 1965, a trust indenture was finalized between petitioner and his wife (Cary group), and Lester A. Sorenson, Bernard D. Cooper, and James E. Millar, trustees (LBJ group), representing employees of Weaver Bros. and other investors. By the provisions of the trust agreement, the trustees and titleholders for the joint venture (Footer syndicate) were James H. Dodge, Martin R. West, Jr., and James E. Millar. The indenture further provided the LBJ group would contribute $150,000 in cash as its consideration for the venture, and the Cary group would contribute Cary's contract rights and pay any additional settlement costs. The remaining contract terms were substantially the same as those enumerated in the Kelsey tract trust indenture dated November 16, 1964. Settlement on the purchase of the Footer tract was completed December 29, 1965. The property was deeded to the trustees in return for the Footer syndicate's initial payment: $150,000 paid by the LBJ group and $72,015.41 paid 17 by the Cary group. [10] At the time of the settlement the Footer tract had been rezoned for apartments and townhouses through the efforts of Pica's attorney, John Hazel. [11] The Footer tract trust indenture, like the Kelsey tract *106 trust indenture, granted Pica the right of first refusal to purchase the property at prices to be determined by the syndicate trustees. However, when Pica sought to repurchase the Footer tract Pica was unable to obtain a binding contractual right to purchase the entire tract from the syndicate at a fixed price as it had the Kelsey tract. Instead, it was decided that the corporation could buy parts of the tract whenever it chose to do so in the future, but at the fair market value of the property at the time of the 18 purchase. Subsequently, on November 1, 1966, Cary, Inc., purchased a 10.606-acre parcel, zoned for townhouse construction, from the Footer syndicate for $81,250. [12] The financial records *107 of the Footer syndicate are maintained by the same CPA who kept the records for the Kelsey syndicate. The syndicate's books are set up as a joint venture with capital accounts for both the Cary group and the LBJ group. Tax data is prepared annually by the accountants and delivered to the Footer syndicate trustees for distribution to the individual venturers. During the years at issue, the syndicate did not file a partnership tax return or make any informational report on the earnings of the venturers. On their joint income tax returns for the years 1965 and 1966, petitioners reported long-term capital gain realized from their participation in the Kelsey syndicate 19 in the amounts of $48,855.13 and $180,134.04, respectively. Petitioners also reported salaries in those respective years of $81,647.88 and $76,136.04. Additionally, on their 1966 return petitioners reported long-term capital gain realized from their participation in the Footer syndicate in the amount of $11,900.17. [13]
In his notice of deficiency dated October 23, 1969, respondent determined that the profits realized by petitioners *108 from the Kelsey and Footer tracts in 1965 and 1966 were ordinary income. OPINION I am still uncertain of the precise basis on which respondent claims that the profits realized by petitioners on the Kelsey and Footer transactions should be taxed to them as ordinary income rather than capital gain in the years 1965 and 1966, just as I indicated such uncertainty at the beginning of the trial. In his notice of deficiency respondent determined that the gain realized on the sale of the real estate from the Kelsey and Footer tracts by the Carys is reportable as ordinary income, with no explanation of his reason therefor. 20 His original answer was a general denial of the allegations of the petition with respect to these issues. When the trial was started with the testimony of one witness taken early, respondent announced his intention to file a motion for leave to file an amendment to his answer. The motion and amendment to the answer were filed prior to the resumption of the trial about a week later, and the motion was granted and the amendment filed. The amendment to the answer alleges that, in further support of the determination that petitioners received ordinary income instead *109 of capital gains in 1965 and 1966, (a) Thomas Cary never filed a gift tax return reflecting a transfer of an interest in the Kelsey and Footer tracts to his wife; and (b) the transfer by Pica, Inc., of a one-half undivided interest in the two tracts to Cary and the retransfer of that interest to Pica, Inc., were integrated transactions the net effect of which was to transfer and vest in Cary dividend income in 1965 and 1966. On brief respondent specifically conceded the issues raised by the amended answer. In the opening part of his brief respondent states the questions presented to be: "Was the 50% undivided interest in the Kelsey [and Footer] tract held by the petitioners individually for resale and not for purpose of investment?" or, "Alternatively, was the 50% undivided interest in the Kelsey [and Footer] tract owned by petitioners held in joint venture for resale and 21 not for the purpose of investment?" Part I of respondent's argument on brief is that, assuming a joint venture, the evidence shows that each venturer was in the real estate business, either alone or through agents, and the primary purpose for holding the Kelsey and Footer tracts was for purposes of sale. Part *110 II of respondent's argument is that the transfer of a 50-percent interest in the Kelsey and Footer tracts to Cary had no business purpose and Cary received ordinary income on the retransfer back to Pica. In short, respondent appears to be advancing in support of his determination about any argument that occurs to him, without pointing out specifically how those arguments support his determination. In fact, respondent's scattergun arguments lend credence to my assumption that had Cary originally contracted to purchase the two tracts in his own name rather than having Pica do so, and then followed the syndication procedure and later sale to Pica, and/or had the profit on the Kelsey tract not been so great within a reasonably short period of time, this case would not be here. [14] *111 In other 22 words, respondent's argument suggests that he felt that such a large profit realized in such a short time should be taxed as ordinary income although he was not sure just why. [15] Nevertheless, the issue has been raised and petitioner has the burden of proving that respondent erred in his determinations. I believe the evidence supports that burden.
The question whether profits realized from the sale of real estate are ordinary income or capital gains turns on a determination whether the property involved was held primarily for sale to customers in the ordinary course of the seller's trade or business. Robert W. Pointer, 48 T.C. 906 (1967), affd. 419 F.2d 213 *112 (C.A. 9, 1969). This is so because the definition of a "capital asset" in section 1221[16] includes all property held by the taxpayer (whether or not connected with his trade or business) except property of the type set out in paragraphs (1) through (5). The exception involved 23 here is contained in paragraph (1) which is "property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." In Malat v. Riddell, 383 U.S. 569 (1966), which involved property held by a joint venture with a dual purpose of developing or selling, the Supreme Court held that "as used in § 1221(1), "primarily" means "of first importance" or "principally."" This presents a factual question depending on the circumstances in each case. Robert A. Boyer, 58 T.C. 316 (1972). The seller's purpose for holding the property at the time of sale is determinative. S.O. Bynum, 46 T.C. 295 (1966). An assortment of factors has been compiled by courts confronted with this issue which may be used objectively to determine if the subject property was held "primarily" or "principally" for sale in the ordinary *113 course of the seller's trade or business. Many of them are listed in the opinion in Kaltreider v. Commissioner, 255 F.2d 833 (C.A. 3, 1958), affirming 28 T.C. 121, and in numerous other opinions, and I will not relist them here. Suffice it to say that with those precepts in mind, I have carefully weighed the evidence in the record and conclude that the acquisition of the Kelsey and Footer tracts by the syndicates or joint ventures were for speculative investment purposes and that at the time the Kelsey tract was reconveyed to Pica in 1965 and at the time certain parcels of the Footer tract were reconveyed to 24 Pica in 1966, those properties were not held by the syndicates primarily for sale to customers in the ordinary course of any trade or business engaged in by the syndicates at those times. Clearly, the Kelsey syndicate and the Footer syndicate were both joint ventures and thus partnerships for tax purposes. Hyman Podell, 55 T.C. 429 (1970). See also section 761(a) and 7701(a) (2). The parties agree, as do I, that such being the case, we must look to the purpose for which the partnership held the property, rather than the intent of any specific partner, to determine the purpose *114 for which the property was held at the time of the sales. Riddell v. Scales, 406 F.2d 210 (C.A. 9, 1969); Estate of Freeland v. Commissioner, 393 F.2d 573 (C.A. 9, 1968); Hyman Podell, supra.And once that is established the partners, or conventurers, must characterize their distributive shares of the profits from the syndicated property "as if * * * [they] were realized directly from the source from which realized by the partnership * * *." Sec. 702(b). There is no evidence that either syndicate was in the real estate business or held the properties involved in 1965 and 1966 for any purpose other than speculative investment. They did not subdivide, develop, or promote the sale of the properties during 1965 and 1966, and, of course, they 25 did not come into existence prior to the times they acquired the two tracts. The evidence is to the contrary, i.e., that they were passive holders of interests in the properties. Respondent urges that petitioners and the other members of the two syndicates were in the real estate business and their participation permeated the purpose of the syndicates. I do not accept this contention for two reasons. First, I am satisfied the record does not *115 establish that any of the venturers were actually engaged in the real estate business. The evidence is clear that Cary was not engaged in the real estate business in his individual capacity; he always conducted his real estate business in corporate form. The evidence indicates that many of the investors in the syndicates were involved in trades or businesses closely related to the real estate business, e.g., mortgage banking and employees of land development corporations. However, I could find no proof in the record that any member of the two syndicates traded in real estate with enough regularity to be considered in the trade or business. Secondly, assuming that respondent's allegation was correct, participation of a real estate dealer in a land venture does not, in itself, vitiate the investment purpose of the undertaking, for it is well settled that an individual in the real estate business may occupy a dual role: Real estate businessman and investor. Eline Realty Co., 26 35 T.C. 1 (1960); Charles E. Mieg, 32 T.C. 1314 (1959); D. L. Phillips, 24 T.C. 435 (1955); Walter R. Crabtree, 20 T.C. 841 (1953); Nelson A. Farry, 13 T.C. 8, 1949). Plainly, Pica's motive for acquiring the *116 two tracts was to develop them for sale to customers. However, petitioners, the two syndicates, and Pica were all separate entities for tax purposes, cf. Burnet v. Clark, 287 U.S. 410 (1932); Whipple v. Commissioner, 373 U.S. 193; George W. Mitchell, 47 T.C. 120 (1966), and the corporation's motives should not be imputed to the petitioners or the syndicates unless it was serving as an agent for them. See Kaltreider v. Commissioner, supra; Robert A. Boyer, supra. In my view, the record fails to establish any such agency. Both Cary and Martin West, Jr., who was president of Weaver Bros. and appears to have been the dominant factor in the two investment groups, testified at length. I was firmly convinced by their testimony that there was no community of interest between the Cary group and the RBJ and LBJ groups except as joint venturers in the Kelsey and Footer syndicates, respectively. I can see no reason why Cary would be willing to let the promoters take a 10-percent commission for putting the syndicates together and giving the unrelated investment groups a 50-percent interest in the two syndicates if the profits to be realized by the syndicates were to be produced by the real *117 estate activities of Pica 27 acting as agent for the syndicates. Furthermore, it is clear that the sale prices to Pica were determined by West and Millar, as two of the three trustees, who had no interest in Pica but were involved with the investment groups. The profits realized by the syndicates resulted from the price increases rather than any activity on the part of Pica. To say that Pica was acting as agent for the syndicates under the circumstances is farfetched and entirely unsupported by any evidence. Furthermore, the fact the syndicates acquired the two tracts with a view to eventual resale at a profit is not decisive, William B. Howell, 57 T.C. 546 (1972); George W. Mitchell, supra; Wellesley A. Ayling, 32 T.C. 704 (1959); nor is the fact that profits in substantial amounts were realized in a relatively short time. [17]
While it may be difficult for those of us not involved in real estate development business to understand how the value of these two tracts could increase so much in such a relatively short time without some activity on the part of the owners, the explanation offered by petitioners and their witnesses is plausible. *118 The fact that Pica contracted to acquire the two tracts at fair market value as of the contract dates is borne out of the circumstances that Pica contracted 28 at arm's length with the unrelated owners thereof and paid a price mutually agreed upon. With respect to the Kelsey tract, Pica did some work on it while it was the contract holder such as making preliminary plats, rezoning efforts, and efforts to obtain sewage rights for the property. But if this activity increased the value of the property, any tax consequences arising therefrom should have occurred in 1964. However, when it appeared in the latter part of 1964 that a sewage disposal facility would probably not be available for some time, it was a reasonable business judgment for Pica, which was a vibrant, fast-moving but thinly capitalized real estate development corporation, to get out from under the burden of the carrying charges under the Kelsey contract until the sewage disposal facility became available, particularly when it could retain the right of first refusal to buy the property back. The thought that the development of the sewer facility was a long-range project was more than illusory, as illustrated by the *119 fact that the owners of interests in the Kelsey tract agreed to extend the time the mortgage curtailments were to begin to 1969, and by the cash flow chart drawn up by the Kelsey syndicate which did not reflect curtailment payments until 1969. We think it is highly unlikely that at the purchase date either Cary or the other participants in the venture had reason to know or suspect the rapid chain of events which did occur 29 would come about so soon. Surely had Cary been aware of it he would not have been so willing to divest himself and/or his corporation of 50 percent of the profits of the venture in order to obtain such a relatively small amount of financial assistance. It also appears from the evidence of sales of comparable properties and petitioner's expert testimony that the price Pica paid for reconveyance of the Kelsey tract was not unreasonable after it had become apparent that the property could be sewered and developed with temporary facilities until the Pohick trunk sewer line could be completed. Perhaps petitioners' conventurers, who set the resale price, were more knowledgeable about the real value of the real estate than were Cary and the former owners; or possibly *120 it is just the fact that sewage disposal "is the name of the game" in real estate development, as one of petitioners' witnesses testified. But in any event the profit realized by the syndicate on the reconveyance of the Kelsey tract appears to have been legitimate and obtained without any real estate activity on their part. [18] 30 The reason for the formation of the Footer syndicate and the sale to it of the Footer tract at Pica's cost therein is somewhat different and more difficult to understand, although we are inclined to accept Cary's testimony that it was his business judgment that it was the better thing for Pica to do under all the circumstances. There were no blocks in the way of immediate development and sale of the Footer tract when Pica contracted *121 to purchase it. Cary testified that when Pica entered into this contract in July of 1965 Pica was accumulating some cash from its profits from other developments and he thought it would be able to meet the settlement payments when due without need for third-party financing. However, because the cost of land acquisition and construction financing suddenly mushroomed (by requiring additional "points") as the closing date approached, Pica found itself without surplus funds and Cary thought it best for Pica to sell the purchase contract to another syndicate for what it had in it rather than commit all of its funds to this one project at the expense of other projects then underway. While in retrospect this may not have been the best judgment, I cannot believe Cary would have given up half the potential profits on this venture to unrelated third parties unless he thought it was best at the time. 31 Here again the price at which the syndicate acquired the property from Cary and Pica was the same as Pica had agreed to pay for it in an arm's-length transaction, plus expenses already incurred by Pica, and there is little evidence that Pica had done much toward development of the property *122 before it assigned its rights to the syndicate. And the evidence reflects that the Footer syndicate did not engage in any real estate development activities with respect to this property during 1965 and 1966 which would account for the profit realized by the syndicate on the resale of several parcels of the tract to Pica in 1966. Likewise the evidence indicates that the prices paid by Pica for these parcels were not out of line when compared with sales of other comparable properties. After viewing all the evidence, which I frankly approached with some skepticism, I am convinced that the two syndicates did not acquire or hold, on the crucial dates, the Kelsey and Footer tracts primarily for sale to customers in the ordinary course of their trades or businesses; rather they held them primarily for speculative investment purposes. I am also convinced that Cary did not acquire or hold an interest in either tract primarily for sale to customers in the ordinary course of his business. These were isolated transactions so far as petitioners were concerned, and both syndicates were formed to deal with a single tract 32 of land. Neither Cary, individually, nor either syndicate had engaged *123 in the real estate business in those capacities. I believe that if a number of individuals or groups engaged in numerous syndicated speculative investment activities over a period of time it might well develop into a business, but such would apparently not be the case with petitioner, Cary, who has not been involved in any real estate syndications since the Footer syndicate. It should be obvious from the above discussion that I am not convinced by respondent's contention that each of these transactions must be viewed as integrated transactions with the sole purpose being to permit petitioners to skim the profits out of the ventures while the properties were purportedly owned by the syndicate. First, I do not believe the transfers by Pica and the reconveyances to Pica were planned integrated transactions for the purpose claimed by respondent. Second, if by an integrated transaction respondent means that there was in substance no assignment of its interests in the properties by Pica, respondent has failed to point out how this would result in ordinary income to petitioners. If Pica owned the property and its activities were responsible for the profit, that profit should be taxable *124 to Pica, and petitioners would have no gain except possibly by some sort of constructive dividend theory, which respondent abandoned on brief. 33 In Part II of his argument on brief respondent attempts to decimate the transactions and split the syndicates assunder by admitting that Pica had a need for third-party financing, thus apparently justifying the 50 percent of the profit that went to the RBJ and LBJ groups, but claiming there was no business purpose for permitting petitioners to realize the other 50 percent of the syndicate's profits because Cary operated entirely through Pica and Pica was responsible for the profits.Respondent's argument consists of statements of various factual and unconnected legal premises which in my opinion do not point to any theory for treating Cary's share of the syndicates' profits differently than the profits of the syndicates themselves. There is no evidence to support respondent's factual premise that Cary and Pica were acting as one in these transactions, see Ralph E. Gordy, 36 T.C. 855 (1961), or that Cary's or Pica's real estate activities produced the income in issue. Without some evidence or clear-cut legal theory for treating the transactions *125 otherwise, I must find that the substance of the transactions were the same as their form. Respondent quotes from Minnesota Tea Co. v. Helvering, 302 U.S. 609 (1938): "A given result at the end of a straight path is not made a different result because reached by following a more circuitous [sic, in brief] route." I will suggest to respondent that if there is a direct argument 34 which requires the result he seeks, he should have substituted it for the circuitous argument he makes which leads to nowhere. I hold for petitioners on the issue litigated. However, due to petitioner's concession of several minor adjustments to his income made in the notice of deficiency, Decision will be entered under Rule 50. Footnotes
1. Hereinafter both corporations will be referred to as Pica. ↩
2. Pica's financial statement for its fiscal year ended October 31, 1964, prepared by its accountant reflects that the corporation's business operations were experiencing a serious liquidity problem. Pica had the same problem during its next year which ended October 31, 1965. ↩
3. On November 17, 1964, petitioners liquidated a substantial portion of their $50,000 outstanding note to Pica with a payment of $40,726.21. The balance of the note, plus interest, was paid on October 20, 1965. ↩
4. At settlement, the Cary group actually paid $9,273.79 in additional settlement costs. ↩
5. The trunk line for the Pohick watershed was not completed and connected to all of the Kelsey tract until 1969. 6. The prices were to be adjusted at the rate of $3,500 per lot, depending on whether Pica was able to exceed the number of lots projected in each parcel. ↩
7. Though settlement on the first parcel actually occurred on October 15, 1965, the 117.169 acres were conveyed to Pica in two separate deeds, one conveying the remaining 117.169 acres dated October 13, 1965. A deed of dedication and release, dated October 13, 1965, conveyed 29.873 acres from Pica to the proper public officials was recorded on October 15, 1965. Pica obtained tentative FHA approval on August 26, 1965, for the first 30 acres of the Kelsey tract it intended to develop. Finally, building permits for three model homes to be constructed on the Kelsey tract were issued on August 25, 1965. ↩
8. The $163,280.83 in cash paid by Pica at settlement came from a land acquisition drawn on the construction loans made to develop the first 30 acres of the Kelsey tract. ↩
9. Pica made a $10,000 deposit as consideration for the purchase rights of the property. 10. The Cary group made two loans from Pica to cover the expenses that had to be satisfied at the settlement on the Footer tract: On December 29, 1965, the Cary group borrowed $75,000 from Pica to pay its share of the settlement costs, and on January 3, 1966, the Cary group borrowed $16,065.05 from Pica to repay the corporation for some of its investment in the Footer tract; i.e., the $10,000 contract deposit and $6,065.05 in engineering fees. The two loans plus certain other amounts owed Pica were repaid by the Cary group on January 20, 1966, with distributions received from the Kelsey syndicate. ↩
11. The rezoning was obtained for Pica on November 10, 1965, and Pica paid the attorney's fees resulting therefrom. ↩
12. In the years subsequent to 1966, Cary, Inc., was the only purchaser of any portion of the Footer tract. The corporation purchased parcels of 11.20879 acres at $1,500 per lot, 48,495 square feet at $2,000 per lot, and 31.3364 acres at $2,500 per lot in 1968, 1969, and 1970, respectively. However, in 1971, there were pending negotiations between the Footer syndicate and developers other than Cary, Inc., for the sale of a portion of the Footer tract for construction of a shopping center. ↩
13. For some unexplained reason, the notice of deficiency used the figure of $11,883.99. ↩
14. Evidence was introduced that while the ordinary income versus capital gain issue was raised by respondent's agents in audit of the tax returns of other members of these syndicates, such issue was conceded by respondent at the appellate level. While clearly not conclusive for purposes of this case an explanation of why the Carys were treated differently than other members of the syndicates with respect to these transactions would be helpful in the light of respondent's argument that the tax treatment of distributions to partners or joint venturers are characterized by the status of the income from which the distributions were made in the hands of the partnership. 15. I do not mean to be unduly critical by this statement because it is difficult for the average person to understand how the value of this property could increase so greatly in such a short time without considerable real estate activity on the part of the owners. ↩
16. All section references are to the Internal Revenue Code of 1954, as amended. ↩
17. See Thomas W. Nevin, T.C. Memo. 1965-53↩. 18. This case is different from Robert A. Boyer, 58 T.C. 316↩ (1972), because in that case the sellers, who were the taxpayers, conducted the real estate activities using the controlled buyer corporation as a front, and also the price at which the sales were made to the corporation were unrealistic. Here, the price at which the syndicate sold the land to Pica was realistic and Pica appears to have made a profit on the development.