RICHARD H. AND PATSY J. BRAMBLETT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bramblett v. Commissioner
Docket No. 728-89
United States Tax Court
T.C. Memo 1990-296; 1990 Tax Ct. Memo LEXIS 314; 59 T.C.M. (CCH) 876; T.C.M. (RIA) 90296; June 14, 1990, Filed *314 Decision will be entered under Rule 155. C. F. Allison, Jr., Brenda K. Leighton, and H. Campbell Zachary, for the petitioners. Richard *315 D. Ames, for the respondent. COHEN, Judge. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Year
Deficiency
Sec. 6653(a)(1)
Sec. 6653(a)(2)
Sec. 6661
1983
$ 413,815
$ 20,691
*
$ 103,454
1984
105,059
5,253
*
26,265
Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the years in issue. After concessions, the sole issue remaining for decision is whether gain on the sale of certain land is capital gain or ordinary income. FINDINGS OF FACT Some of the facts have been stipulated, and the facts set forth in the stipulation are incorporated in our findings by this reference. Richard H. and Patsy J. Bramblett (petitioners) resided in Dallas, Texas, when they filed their petition in this *316 case. Beginning in late 1978, petitioner Richard H. Bramblett (Bramblett) was employed by the Richard Bramblett Company and performed financial workouts of bad loans for various lending institutions. In late 1978 or early 1979, George E. Porteck (Porteck), a real estate broker, presented Willard R. Baker (Baker) with an opportunity to purchase land in Mesquite, Texas, next to a major shopping center. Although the property did not have the zoning, sewerage, and access necessary for development, Baker believed that the property had single-family, multi-family, and commercial development possibilities because another housing developer had developed and sold single-family homes in the proximate area. Subsequently, Baker executed contingent contracts to purchase approximately 264.5 acres of this property. The contract allowed Baker to decline to purchase the land if the proper zoning, access, and sewerage could not be obtained. If the necessary financing could be arranged, Baker intended that a corporation would purchase and develop the property. Neither Baker nor his land development company had the ability to finance the acquisition of the property. Baker, therefore, began *317 to make inquiries regarding a financial partner. Porteck arranged a meeting between Baker and Bramblett, and Bramblett subsequently became interested in investing in the property. Bramblett then contacted John F. Sexton (Sexton) about investing in the property, and Sexton contacted Robert H. Walker (Walker). Bramblett, Walker, and Sexton expressed the desire that ownership of the property be regarded as an investment, i.e., that the property would be held for long-term capital gain. Baker, Bramblett, Walker, and Sexton solicited the advice of attorneys and certified public accountants in order to structure the acquisition of the property to establish the position that the property was acquired as an investment rather than for resale. At the time the property was to be acquired, the usury laws in the State of Texas provided that lenders could charge a higher rate of interest to corporations than to individuals. In order to secure bank financing for the joint venture, Bramblett formed Bramco, Inc. (Bramco), a Texas corporation, on May 7, 1979. Bramblett was the sole shareholder of Bramco. On May 15, 1979, Bramco obtained a bank loan and acquired title to 180.06 acres of undeveloped *318 land in Mesquite, Texas (the Bramco property), that Baker had under contract. Bramco paid the following amounts for the Bramco property: Acres
Purchase Price
66.251
$   828,137.50 24.740
235,030.00 50.069
480,662.40 19.500
146,250.00 19.500
146,250.00 180.060
$ 1,836,329.90 Mesquite East Joint Venture (Mesquite East), a Texas joint venture, was formed on May 16, 1979, by Baker, Bramblett, Walker, and Sexton. Baker, Bramblett, Walker, and Sexton had a 50-percent, 22-percent, 18-percent, and 10-percent interest, respectively, in the profits and losses of Mesquite East. It is common practice in land development ventures for the developer to receive a 50-percent interest in the venture and the financial partners to receive the other 50-percent interest. The stated purpose of the joint venture was: to acquire and hold, for investment purposes those tracts of vacant land * * * and to do all things reasonably incident to the acquisition and the holding of the Land for investment purposes, including borrowing money, securing such borrowing by mortgage, pledge or other lien, and selling, or otherwise disposing of the Land.
On *319 its Forms 1065, "U.S. Partnership Return of Income," for 1980 through 1987, Mesquite East listed its principal business activity as "investments" and its principal product or service as "real estate." Mesquite East's application for an employer identification number listed its activity as land investment and real estate. Town East Development Company (Town East), a Texas corporation, was formed on June 4, 1979, by Baker, Bramblett, Walker, and Sexton for the purpose of developing and selling real property in the Mesquite area. At all relevant times, Baker, Bramblett, Walker, and Sexton were the shareholders of Town East. Baker, Bramblett, Walker, and Sexton owned 50 percent, 22 percent, 18 percent, and 10 percent, respectively, of the stock of Town East, the same as their respective ownership interests in Mesquite East. In 1979 and 1980, Bramco transferred the Bramco property to Mesquite East as follows: Date
Acres
Nov. 15, 1979
70.1699
Nov. 30, 1979
7.6929
Feb. 20, 1980
102.2812
Total
180.1440
Mesquite East assumed Bramco's liability for payment of the full purchase price of the Bramco property. The individual partners of Mesquite East guaranteed *320 the indebtedness assumed by Mesquite East. In September 1979, Mesquite East acquired an additional 84.5 acres of land in Mesquite, Texas, from Palos Verdes Venture for a total purchase price of $ 884,000. Due to a change in the usury laws in Texas, Mesquite East was able to secure a bank loan to finance the purchase without the need to use Bramco as its agent. The 180.06 acres of the Bramco property combined with the 84.5 acres acquired from Palos Verdes Venture is hereinafter referred to as the "original property." At the time the original property was acquired, Mesquite East had no prospective purchasers for any portion of the property. Prior to the sale of property at issue herein, Mesquite East made the following four sales of the original property: Date
Purchaser
Acres
Sales Price
11/15/79
Town East
70.1699
$   795,824.26
11/30/79
Town East
7.6929
99,001.05
02/20/80
Town East
48.9558
500,000.00
12/14/81
Langston
13.5504
250,859.23
Total
140.3690
$ 1,645,684.54
On November 9, 1979, Town East entered into an agreement with Centennial Homes, Inc. (Centennial), pursuant to which Town East would act as a general contractor for *321 the development of residential lots on approximately 70 acres of land owned by Mesquite East. On November 15, 1979, Mesquite East transferred 70.1699 acres to Town East. On November 16, 1979, Centennial purchased the 70.1699 acres from Town East. In the fall of 1979, the Mesquite Independent School District selected approximately 7.7 acres of land owned by Mesquite East as a location for a future school site. Mesquite East transferred 7.6929 acres to Town East on November 30, 1979, and Town East transferred the property to the Mesquite Independent School District on December 13, 1979. On February 6, 1980, Town East entered into an agreement with General Homes Consolidated Companies, Inc. (General Homes), pursuant to which Town East would act as a general contractor for the development of residential lots on approximately 49 acres of land owned by Mesquite East. Mesquite East transferred 48.9558 acres to Town East on February 20, 1980. Subsequently, Town East developed lots on the property for General Homes. In late 1981, an unrelated joint venture known as Langston/R&B Financial Joint Venture No. 1 approached Mesquite East about acquiring approximately 13.6 acres of land *322 (Tract H). Tract H was not contiguous to any of the other property held by Mesquite East, was in a different municipality than the other property, and was located on a flood plain. Because Tract H had no continuing value as an investment, Mesquite East sold the property to the unrelated joint venture. At the end of 1981, following the four sales described above, Mesquite East owned approximately 121 acres of the original property. Mesquite East's gross profit on these four sales totaled $ 68,394.80. On its partnership return for 1981, Mesquite East reported the gain from the four transfers as ordinary income. The decision to report the gain from the sales as ordinary income was made by Mesquite East's certified public accountants and was based on the assumption that reporting the sales as ordinary income would preserve the character of the remaining property as a capital asset. In 1982, potential purchasers began contacting Mesquite East about purchasing portions of the remaining property. At the time, it was not normal practice for sellers of commercial property to list such property for sale with real estate agents. Mesquite East had intended to sell the entire property *323 to a single purchaser. After holding the property for more than 3 years, however, the partners recognized that it would not be wise to ignore potential purchasers. Baker, acting as trustee, entered into five contingent contracts of sale for portions of the property. Each contract of sale was initiated by the potential purchaser and not by Baker, Mesquite East, or Town East. To avoid jeopardizing the status of the property as a capital asset, Mesquite East sought advice from attorneys and a certified public accountant on how to proceed with the disposition of the remaining original property. Based on the advice received, Mesquite East obtained an independent appraisal of the remaining property. In December 1982, an independent appraiser, Joseph J. Blake and Associates, Inc., appraised the 121 acres. The appraisal used seven comparable sales, three of which were open contracts for sales between Baker, as trustee, and Landmark Properties, D. Walker, and Nobel Kidd. The appraiser determined the fair market value of the remaining original property to be $ 9,830,000. Subsequently, on December 17, 1982, Mesquite East sold the property to Town East for $ 9,830,000. In consideration *324 for the transfer, Town East executed two notes in payment of the purchase price, one in the principal amount of $ 3,000,000 and one in the principal amount of $ 6,830,000. The notes provided for interest payments at the rate of 12 percent per annum on the unpaid principal balance. Specifically, the notes provided for payments of principal and interest as follows: Interest for each calendar year, or part thereof, of the term of this Note shall be calculated as of the end of each year and at maturity and shall be payable on or before the one year anniversary date of this Note and each consecutive one year anniversary date thereafter and at maturity, the first annual interest payment being due on or before the 16th day of December, 1983. In addition to the installments of interest due hereunder, on or before the second year anniversary date of this Note and continuing on or before each consecutive one year anniversary date thereafter, installments of principal in the amount of ONE MILLION FIVE HUNDRED THOUSAND AND NO/100 DOLLARS ($ 1,500,000.00) each shall be due and payable, continuing until and including the maturity date hereof, when the unpaid principal balance hereof, together *325 with accrued interest thereon, shall be due and payable.
In documenting the transaction between Mesquite East and Town East, all of the formalities of a bona fide sale were observed, including proper corporate and partnership authorizations, a contract of sale, a recorded deed, and a sales price equal to the fair market value of the property. Following the sale to Town East, Mesquite East did not own any real property and never acquired any additional real property. Prior to Mesquite East's transfer of the remaining 121 acres to Town East, Town East had placed approximately 78 acres under contract of sale to third parties. Specifically, the contract of sale for approximately 10.9 acres to Landmark Properties was entered into by Baker and Bramblett, as trustee, on September 22, 1982, 3 months before Town East acquired the property from Mesquite East. The contracts of sale with Nobel Kidd; D. Walker, trustee; R. Ginsburg, trustee; and Outlet Mall were entered into by Baker, as trustee, in November 1982, approximately a month before Town East acquired the properties from Mesquite East. After Town East purchased the property from Mesquite East in December 1982, it developed *326 the property by installing streets, storm drainage, sanitary sewer lines, and water lines. During 1983, Town East paid over $ 850,000 for improvements and development. Town East sold the property purchased from Mesquite East to unrelated third parties as follows: Date
Purchaser
Acres
Sales Price
12/22/82
Landmark Properties
10.8934
$    917,663.25
12/20/82
Noble Kidd Development
7.0500 805,000.00
04/25/83
D. Walker, Trustee
9.4565
1,029,812.50
07/14/83
R. Ginsburg, Trustee
8.1093
883,102.77
03/18/83
Outlet Mall
26.4000
3,392,438.05
06/28/83
Connell Horn
13.8000
2,103,948.00
08/30/83
Connell Horn
6.1578
1,609,374.00
01/03/84
Westwind Properties
4.8259
1,366,405.30
Total
86.6929
$ 12,107,743.87
Town East's gross profit from these eight sales totaled $ 2,277,743.87 ($ 12,107,743.87 - $ 9,830,000.00). Following these sales, Town East owned two tracts of the property purchased from Mesquite East. On June 30, 1988, Town East deeded these tracts to First RepublicBankDallas, N.A., a third-party lienholder, in lieu of foreclosure. At no time during the years in issue did Mesquite East hire brokers or make *327 any attempt to advertise or sell any of the property it owned. Mesquite East did not maintain an office, and none of Mesquite East's partners spent more than a minimal amount of time on the activities of the joint venture. Mesquite East did not subdivide, develop, or improve any of the property it owned. The only development work performed by Town East was the development of property purchased from Mesquite East. Mesquite East did not receive any cash from the sale of the property to Town East until Town East sold the property to third parties. Town East did not pay Mesquite East the interest on the notes pursuant to the terms of the promissory notes. In 1983 and 1984, Mesquite East received payments from Town East on the notes from its sale of the original property. By 1984, the entire principal amount of the notes had been paid by Town East. Mesquite East reported $ 5,662,489.70 and $ 1,851,819.07, respectively, as capital gain on its 1983 and 1984 partnership returns. The books and records for Mesquite East and Town East, as well as their tax returns, were prepared and maintained by Zelmer Zach Tannery (Tannery), a certified public accountant, from information supplied *328 by Bramblett. OPINION Petitioners argue that the property held by Mesquite East was a capital asset at the time of its sale to Town East and, therefore, the gain on the sale was properly reported as capital gain. Respondent contends that the gain on the sale of property from Mesquite East to Town East should be characterized as ordinary income rather than capital gain. Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure; Maddux Construction Co. v. Commissioner, 54 T.C. 1278, 1284 (1970). Because the capital gain provisions are an exception to the normal tax rates, they are to be narrowly construed. Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 134 (1960); Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52 (1955). Section 1202(a), as in effect during the years in issue, allowed a taxpayer a 60-percent deduction for net long-term capital gains. (Section 1202 was repealed by section 301(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2752.) Net capital gains are determined by reference to whether an *329 asset is classified as a capital asset. Sec. 1221(1). A capital asset is defined in section 1221 as: property held by the taxpayer (whether or not connected with his trade or business), but does not include -- (1) * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business.
The Supreme Court commented on section 1221(1) in Malat v. Riddell, 383 U.S. 569, 572 (1966): The purpose of the statutory provision with which we deal is to differentiate between the "profits and losses arising from every day operation of a business" on the one hand ( Corn Products Refining Co. v. Commissioner, 350 U.S. 46, 52 * * * ), and "the realization of appreciation in value accrued over a substantial period of time" on the other. ( Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 134 * * * The question of whether property is held primarily for sale to customers in the ordinary course of a taxpayer's trade or business is necessarily a factual determination. Maddux Construction Co. v. Commissioner, supra.The Court of Appeals *330 for the Fifth Circuit, in United States v. Winthrop, 417 F.2d 905 (5th Cir. 1969); Biedenharn Realty Co. v. United States, 526 F.2d 409 (5th Cir. 1976); Suburban Realty Co. v. United States, 615 F.2d 171 (5th Cir. 1980); and Byram v. United States, 705 F.2d 1418 (5th Cir. 1983), has developed a framework for determining whether sales of land are considered sales of a capital asset or sales of property held primarily for sale to customers in the ordinary course of a taxpayer's trade or business. In Suburban Realty Co. v. United States, 615 F.2d at 178, the Court of Appeals for the Fifth Circuit noted that the definition of "capital asset" gave rise to three questions: (1) Was the taxpayer engaged in a trade or business, and, if so, what business? (2) Was the taxpayer holding the property primarily for sale in that business? and (3) Were the sales contemplated by the taxpayer "ordinary" in the course of that business? The court then considered various factors, as set forth in Winthrop and Biedenharn, in answering the three questions outlined above: (1) the nature and purpose of the *331 acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. United States v. Winthrop, 417 F.2d at 912; Biedenharn Realty Co. v. United States, 526 F.2d at 416; Suburban Realty Co. v. United States, 615 F.2d at 178. The frequency and substantiality of sales over a substantial period of time are the most important factors to be considered. The conjunction of these two factors, therefore, "will usually conclude the capital gains issue against [the] taxpayer." Suburban Realty Co. v. United States, 615 F.2d at 176-178; Biedenharn Realty Co. v. United States, 526 F.2d at 416-418.Improvements to the property, *332 solicitation and advertising efforts, and brokerage activities have also been held to be especially relevant considerations. Byram v. United States, 705 F.2d at 1424; Suburban Realty Co. v. United States, 615 F.2d at 176; Biedenharn Realty Co. v. United States, 526 F.2d at 415-416. At the same time, the courts have repeatedly emphasized that these factors should not be treated as talismans. United States v. Winthrop, 417 F.2d at 911.Rather, "each case must be decided on its own peculiar facts. * * * Specific factors, or combinations of them, are not necessarily controlling." Biedenharn Realty Co. v. United States, 526 F.2d at 415 (quoting Thompson v. Commissioner, 322 F.2d 122, 127 (5th Cir. 1963)). Petitioners argue that the facts in the instant controversy are similar to those in Byram v. United States, supra.At issue in Byram were seven sales of real property in 1973. The taxpayer had sold a total of 22 parcels of real property over a 3-year period. The taxpayer, however, did not maintain a separate real estate office, did not advertise the seven *333 properties at issue, did not list the properties with a broker, devoted only minimal time and effort to the sales in question, and did not plat or subdivide any of the properties. Byram v. United States, 705 F.2d at 1420.After analyzing these facts in light of Winthrop, Biedenharn Realty, and Suburban Realty, the court determined that the taxpayer was not engaged in the business of selling real property. Thus, the sales of the seven parcels were not ordinary sales in the course of the taxpayer's business. Byram v. United States, 705 F.2d at 1424-1425. The taxpayer in Winthrop subdivided the property and devoted a substantial amount of time, skill, and money to developing and selling the property. Specifically, the taxpayer installed streets, electricity, water facilities, and sewer lines. Although the taxpayer did not engage brokers or maintain an office to sell the lots, selling the lots was the taxpayer's primary business activity during the period in question. The taxpayer sold approximately 456 lots over an 18-year period. In Winthrop, the Court of Appeals for the Fifth Circuit applied the seven factors set forth above *334 to the facts before it and found that the taxpayer held the property in issue primarily for sale to customers in the ordinary course of his business. The court found that the magnitude and continuity of the taxpayer's operations and design led to the conclusion that the sales were a part of a business. 417 F.2d at 911-912. At issue in Biedenharn Realty were the sales of 38 lots in 37 sales over a 3-year period from 1964 to 1966. The case involved the ownership and sale of lots from a 973-acre tract purchased in 1935. Prior to selling the lots, the company had improved the land by adding streets, drainage, water, sewage, and electricity. The Court of Appeals found that the sales were sales of property held primarily for sale to customers in the ordinary course of the company's business. 526 F.2d at 413. In Suburban Realty, the taxpayer did not subdivide the property, did not make significant improvements to the property, and did not engage in advertising or sales solicitation activity. The taxpayer, however, completed at least 244 sales transactions over a 33-year period. The extent of the sales activity alone was enough to convince the *335 court that the sales took place in the ordinary course of a business. As additional support for its decision, however, the court considered the taxpayer's own statements on its tax returns that its principal business activity was "development and sales of real estate." 615 F.2d at 181. Petitioners contend that Mesquite East was not engaged in a business, that it did not hold property primarily for sale in any trade or business, and that the sale of property to Town East was not an ordinary part of any business. Petitioners point out that the stated purpose of the joint venture was to acquire and hold property as an investment, that Mesquite East held the property in question for more than 3 years, and that Mesquite East did not advertise the property, did not hire brokers, and made no attempts to sell the property. Finally, petitioners note that the joint venture did not maintain an office and did not subdivide, improve, or develop the property. Petitioners contend that the facts in the instant case are easily distinguished from those in United States v. Winthrop, supra, Biedenharn Realty Co. v. United States, supra, and *336 Suburban Realty Co. v. United States, supra.Petitioners argue that Mesquite East made only five sales in a 3-year period and did not subdivide or improve the property. Petitioners also note that Mesquite East's tax returns as well as its application for a taxpayer identification number stated that its activity was real estate investments. Respondent argues that the formation of Town East clearly establishes that the parties intended from the outset to develop the land. Respondent asserts that petitioners formed Mesquite East, as a joint venture, to hold title to the land and formed Town East, as a corporation, to develop the property. Thus, respondent contends that the activities of Town East must be taken into consideration in determining whether the number of sales is sufficient to warrant a determination that petitioners were in a trade or business. Petitioners, citing Bradshaw v. United States, 231 Ct. Cl. 144, 683 F.2d 365 (1982); Piedmont Corp. v. Commissioner, 388 F.2d 886 (4th Cir. 1968), revg. a Memorandum Opinion of this Court; and Cary v. Commissioner, T.C. Memo. 1973-197, argue that: the *337 activities of Town should not be attributed to Mesquite East because Mesquite East and Town East were separate and distinct entities for tax purposes, and Town East was not acting as the agent of Mesquite East. Based upon the facts of the present controversy, there is no authority for attributing the activities of Town East to Mesquite East and disregarding the sale of the Property.
The issue in Bradshaw v. United States, supra , and Piedmont Corp. v. Commissioner, supra, was whether transfers of real property in exchange for installment obligations between the taxpayers and their controlled corporations should be considered capital contributions or bona fide sales. Although petitioners concede that the issue in Bradshaw and Piedmont is different from the issue in the instant case, they argue that these cases provide a relevant analysis with respect to treating Mesquite East and Town East as separate and distinct entities. Respondent contends, and we agree, that those cases are distinguishable from the facts in the present controversy. Specifically, in both Bradshaw v. United States, supra, and *338 Piedmont Corp. v. Commissioner, supra, the taxpayers' controlled corporations paid the installment notes on a timely basis. 683 F.2d at 373; 388 F.2d at 888.In the instant case, however, Mesquite East did not receive any cash from the sale of the property to Town East until Town East sold the property to third parties. Additionally, Town East did not pay Mesquite East the interest on the notes pursuant to the terms of the promissory notes. Petitioners also rely on Cary v. Commissioner , T.C. Memo. 1973-197.In Cary, two syndicates in which the taxpayer owned a 50-percent interest purchased two large tracts of land. The syndicates did not develop, promote, or improve the property. Within 1 year after acquiring the property, the syndicates sold all of one tract and part of the other to a corporation wholly owned by the taxpayer. This Court held that the taxpayer's share of the profit realized by the partnerships on the sale of the property to the corporation was capital gain because the partnerships did not acquire or hold the property for sale to customers in the ordinary course of their business. 32 T.C.M. 913 at 920, 73 P-H Memo. T.C. par. 73,197 at 73-887. *339 The Court noted, however, that the decision would have been different if the corporation had been acting as an agent of the taxpayer. The record in this case is replete with evidence from petitioner and his business associates that they intended that gains from sale of the original property be taxed as capital gains. They deny that the joint venture intended to develop the property. They assert that reporting of the initial sales of portions of the property as ordinary income was an error by the accountant. Baker obviously was interested in developing the property. He testified: Q Did you try to convince Mr. Bramblett that it [the property] should be developed as opposed to merely acquired and held for investment purposes? A Oh, I am sure I pointed out the favorable results that I thought would be obtained by development, because that was my business.
Tannery, the certified public accountant for the venture, testified as follows: Q Were you involved in any discussions where a topic discussed was the purpose of this acquisition by Mesquite East Joint Venture? A Yes. Q Can you tell the Court what you understood from these conversations in which you *340 were personally involved that the -- what did the venture intend to do with the property it was to acquire in Mesquite? A The earliest conversations I can recall in that regard was a meeting in my office one Saturday morning with Mr. Sexton, Mr. Bramblett and Mr. Baker to discuss the formation of the venture and the prospects of getting investors to provide the financing, and that type of thing. And it was made clear to me and known to me from the very outset that they were acquiring this land for investment purposes. Q Did you understand -- or have any understanding from your conversations with them as to why they wanted to acquire the property for investment purposes as opposed to some other purposes? A Well, there were several things. One is that the property was fairly remote in its location. The financing was difficult to obtain, and the stated objective of Mr. Bramblett, who was the person that sort of acted as the lead person or the spokesman, I guess you would say, for the investor group, made it clear that that was their intent, was to hold the property for a long-term capital gain appreciation. Q Did you discuss with Mr. Baker and/or Mr. Bramblett the -- any of *341 the factors that would go into whether or not the eventual sale of that property would be treated as long-term capital gain? A Yes. Q What did you discuss with them? A Well, I believe at that point in time I was the primary contact they had regarding the tax advice regarding the Mesquite East Joint Venture and the activities of Mesquite East Joint Venture. Q All right. And did you give them any advice concerning anything to do with either acquiring or holding the property that might assist them in obtaining long-term capital gain when the property was sold? A Yes. They made it very clear to me that they wanted to hold the property for long-term capital gain purposes. They were very concerned about being classified as a dealer. They did not want to be classified as a dealer. * * * Q And as far as the income that was realized by Mesquite East Joint Venture on the transfer of what I will call the General Homes property to Town East Development Company, were you involved in the characterization of that income on the 1065? A Yes. Q How was that income characterized? A As ordinary income. Q Can you tell the Court why it was that the income was characterized or ordinary *342 as opposed to being treated as either long- or short-term capital gain? A Yes. It was the -- from the outset it was the plan to prepare to take long-term capital gain on the primary piece of property, which is identified as property I, and these other properties were not held for a very long period of time. At the time that we prepared those returns, we had a lot of concern about whether we should classify them as a sale of a capital asset or as ordinary income, and during that period of time there was also a lot of emphasis in the tax literature about the number of transactions an entity could have whereby it could possibly disqualify itself as being eligible for long-term capital gain and thereby become a dealer in property. So we did everything that we could to preserve the integrity of the ability to take long-term capital gain on the primary piece of property. Q And who was involved in this decision-making? You referred -- you used the term "we." A Well, myself and other people on the tax staff in our firm.
This opinion by the accountant does not, however, establish that petitioners are entitled to the benefits that they so clearly sought. The *343 substance of the transaction, rather than the intended tax effect, is controlling for tax purposes. Cf. Beard v. Commissioner, 77 T.C. 1275, 1289 (1981). The objective facts, by contrast, are consistent with respondent's determination and argument that that sale of land was the business of the joint venture, Mesquite East, whether conducted directly or through the corporation, Town East. The same four businessmen were the owners, in proportionate shares, of the joint venture and of the corporation. Baker, who was in the land development business, received a 50-percent interest, the share commonly allocated to a developer. The other joint venturers and shareholders received interests totaling 50 percent, the share commonly allocated to financial participants in a land development venture. The corporation was formed approximately a month after the joint venture. The corporation routinely entered into contracts of sale to third parties before acquiring the property subject to the contracts of sale from the joint venture. The corporation made no down payment to the joint venture, issuing promissory notes for payment. The interest payments set forth in the promissory *344 notes were not made, and payments on the notes were not made until funds were received from the third-party purchasers. The corporation performed no development work other than on property initially owned by the joint venture. Petitioners are correct that the entities maintain separate identities for tax purposes, and that separateness has been respected here. Sales of property by the corporation have been taxed to the corporation, consistent with principles expressed in Moline Properties, Inc. v. Commissioner, 319 U.S. 436 (1943).Whether, for tax purposes, a corporation is merely an agent of a partnership or joint venture must now be determined under the standards set forth in Commissioner v. Bollinger, 485 U.S. 340 (1988).The point to be made here, however, is that evidence of the corporation's activities and their correlation with activities of the joint venture is proof of the nature of the business of the joint venture. Notwithstanding the carefully planned declarations of intent by the joint venturers, the totality of the evidence supports the conclusion that the business of the joint venture was sale of land and that the resulting gains *345 should be taxed as ordinary income. Petitioners have not satisfied their burden of proving otherwise. In his brief, respondent states that the questions presented include whether petitioners are liable for additions to tax under section 6653(a) and section 6661. Respondent, however, conceded the additions to tax under section 6661 at trial and the additions to tax under section 6653(a) under a contrary heading in his brief. To reflect our resolution of the remaining issue and a separate agreement between the parties, Decision will be entered under Rule 155.
Footnotes
*. 50 percent of the interest due on the entire deficiency.↩